UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - )
                              )
JESUS M. DELEON               )
          PLAINTIFF           )
                              )
VS.                           ) CASE NO.
                              ) 3:91 CV 00945 (SRU)
POLICE CHIEF EDWARD FLAHERTY, )
ET AL,                        )
          DEFENDANTS          )
                              )
- - - - - - - - - - - - - - - )


DEPOSITION OF CARL BROWN
ON: JANUARY 8, 2003
HELD AT: MOYNAHAN, MINNELLA, BRODERICK &
          TINDALL
          141 East Main Street
          Waterbury, Connecticut  06722


Reporter:  KATHLEEN S. NORTON, RPR, LSR #105
           TYSZKA REPORTING SERVICE
           189 Old Forge Road
           West Hartland, CT  06091
           Tel:  (860) 379-7955


COPY

TYSZKA REPORTING SERVICE

```
 1                        APPEARANCES
 2   Representing the Plaintiff:
 3            MOYNAHAN, MINNELLA, BRODERICK & TINDALL
             141 East Main Street
 4           Waterbury, Connecticut
                 By: JASON M. LIPSKY, ESQ.
 5
 6   Representing the Defendant:
 7            SACK, SPECTOR & KARSTEN, LLP
             836 Farmington Avenue
 8           West Hartford, Connecticut  06119-1544
                 By: MICHELLE HOMES, ESQ.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          I N D E X

2    WITNESS

3

4    CARL BROWN

5    Direct Examination by Ms. Homes ..........    5

6    Cross-Examination By Mr. Lipsky ...........   47

7    Redirect Examination by Ms. Homes ........... 62

8    Recross Examination By Mr. Lipsky ......... 67

9    _____

10   EXHIBITS:                              PAGE

11   _____

12   DEFENDANT'S:        (For Identification)

13   1     Letter dated November 10, 2002 .....   13

14   2     Affidavit .......................... 13

15   3     Voluntary statement ............... 13

16

17

18

19

20

21

22

23

24

25

```
 1
 2                      STIPULATIONS
 3
 4          IT IS STIPULATED by the attorneys for the
 5   Plaintiffs and the Defendants that each party
 6   reserves the right to make specific objections in
 7   open court to each and every question asked and the
 8   answers given thereto by the witness, reserving the
 9   right to move to strike out where applicable, except
10   as to such objections as are directed to the form of
11   the question.
12
13          IT IS STIPULATED and agreed between
14   counsel for the parties that the proof of the
15   authority of the Notary Public before whom this
16   deposition is taken is waived.
17
18          IT IS FURTHER STIPULATED and agreed that
19   the reading and signing of this deposition are
20   waived and any defects in the notice are waived.
21
22
23
24
25
```

```
 1                    (Commencing at 9:30 a.m.)

 2                         CARL BROWN,

 3             having first been duly sworn, was examined

 4             and testified as follows:

 5

 6                    DIRECT EXAMINATION

 7    Q    Do you want to go ahead, Mr. Brown, and give us

 8         your full name and current address.

 9    A    Carl Brown, 9 Harriett Avenue, Waterbury,

10         Connecticut.

11    Q    Have you ever been to a deposition before?

12    A    Nope.

13    Q    This is your first time?

14    A    Yes.

15    Q    I'll give you a couple of ground rules about a

16         deposition.  I don't know if you -- have you

17         met with Attorney Lipsky at all prior to this?

18    A    Yes.

19    Q    Did he prepare you for this deposition?

20    A    No.

21    Q    He just told you to come?

22    A    Yeah.

23    Q    Since you -- let me ask you this:  Are you

24         under the influence of anything that would

25         prevent you from being able to tell the truth
```

1    or understanding the questions during this

2    deposition?

3  A  No.

4  Q  Since we have a court reporter here, when I ask

5    you a question, you have to let me finish the

6    question.  And then when you're ready to answer

7    it, you have to answer out loud, yes, no,

8    whatever your answer might be?

9  A  Yup.

10  Q  Because she is taking everything down.

11         If at some point I ask you a question

12    and you don't understand it, please feel free

13    to ask me to rephrase it.  If you need to take

14    a break or use the restroom, or something, just

15    go ahead and say so and we'll take care of

16    that.

17         Why don't you go ahead and just tell

18    me exactly what you have done to prepare for

19    coming here today.

20  A  Nothing.  I'm here to tell you what happened.

21    That's it.

22  Q  Who did you talk to?  Did you talk to Attorney

23    Lipsky?

24  A  No, Jesus just told me I have to come here and

25    I said, "All right.  Okay.  I'm coming".

```
 1    Q    Did he tell you that over the phone?

 2    A    No, I seen him at my house.

 3    Q    He came to your house?

 4    A    Yes.

 5    Q    Who do you live with at your house?

 6    A    My finance.

 7    Q    What's her name?

 8    A    Melinda Moncelvo; M-O-N-C-E-L-V-O.

 9    Q    Did he come there with Jesus?

10    A    No, Jesus came himself.

11    Q    He came on a different occasion?

12    A    Yeah.

13    Q    And Attorney Lipsky went out and met you on his

14         home?

15    A    No, I didn't meet with him.

16    Q    You didn't meet with him?

17    A    No.

18    Q    He never came to your house?

19    A    No, Jesus came.

20    Q    Oh.  Okay.  Jesus came.  Now, how long have you

21         lived at 9 Harriet Avenue?

22    A    Since August of this year.

23    Q    Where did you live before that?

24    A    I was on Baldwin Street.

25    Q    Baldwin Street?
```

TYSZKA REPORTING SERVICE

1   A   Uh-hum.

2   Q   What's on Baldwin Street?

3   A   My friend Mike, that's where I got paroled to

4       when I got out of jail.

5   Q   Is that a halfway house or --

6   A   No, I was at a regular house.

7   Q   Are you still on parole now?

8   A   Yeah.

9   Q   And what are you on parole for?  What were you

10      originally incarcerated for?

11  A   Selling narcotics and possession.

12  Q   And how long was your sentence?

13  A   Four years.

14  Q   Did you serve four years?

15  A   Huh-uh.

16  Q   How long?

17  A   Two and a half, three.

18  Q   And so how long is your parole for?

19  A   I have six months left.

20  Q   So things are going well for you?

21  A   Yeah.

22  Q   That's good.  Are you working right now?

23  A   I was, but it was temp agency.  Not right now.

24  Q   Where --

25  A   I was at Custom Bottles, but it was a temp

1        agency.

2   Q   What temp agency were you working at?

3   A   Tri-State.

4   Q   I'm sorry?

5   A   Tri-State.

6   Q   Are you still with them?  Are they still

7        helping you look for a job?

8   A   Yeah.

9   Q   Is that one of the conditions of your parole

10       that you have employment?

11  A   Either that or go to school.

12  Q   What's going on with the school?

13  A   I have to sign up. Tomorrow.

14  Q   What sorts of things are you signing up for?

15  A   I'd like to get my GED.

16  Q   What's your date of birth?

17  A   4-18-79.

18  Q   How old are you?

19  A   24.

20  Q   24.  Is this the first time you have been to

21       this office?

22  A   No.

23  Q   When did you come to this office?

24  A   I forget the date.  I think it was, like,

25       sometime last month.

```
 1    Q    What did you come here for?

 2    A    To give him an affidavit, I think.

 3    Q    Okay.  Was the affidavit all ready for you when

 4         you came in, for you to sign?

 5    A    No, he just asked me questions and I answered

 6         them.  He asked me if this is true or not true.

 7         I said it ain't true.  He said, "Tell me like

 8         it is," and then I signed something.

 9    Q    Now, other than the sale of narcotics, have you

10         been arrested before other than that incident?

11    A    Other than this?  Right here right now?

12    Q    The one you're on parole for.

13    A    Yeah, for basic everything like possession of

14         marijuana, sale, larceny, something like that.

15    Q    Do you have, a larceny?

16    A    Yes.

17    Q    Any burglaries?

18    A    No.

19    Q    Have you ever -- other than the three or so

20         years you did for the sale, were you

21         incarcerated before or was it always just

22         probation?

23    A    I was incarcerated.

24    Q    When was the last time you were incarcerated

25         prior to this time, if you understand what I'm
```

1        asking you?

2   A   I never been to jail.  Just been, like, Whalley

3        Avenue and got probation.

4   Q   When you got arrested, you would be

5        incarcerated until the resolution of your court

6        case?

7   A   Probation.

8   Q   But you were given probation up to this last

9        time where you had to serve some time?

10   A   Yes.

11   Q   Do you have any kids?

12   A   Yes.

13   Q   How many kids do you have?

14   A   One.

15   Q   What's his or her name?

16   A   TaKahia.   T-A capital K A-H-I-A and I have a

17        kid on the way right now.

18   Q   Are both your kids with your fiancee?

19   A   No.

20   Q   Do you have -- how do you say her name?

21   A   TaKahia.

22   Q   Do you have a relationship with her?

23   A   Yes.

24   Q   Do you have to -- is there any court orders for

25        you to give child support or anything?

```
 1    A    No.

 2    Q    No?  Have you ever been taken into court for

 3         child support, or anything like that?

 4    A    Huh-uh.  All I know once I went to court with

 5         the mother, but she said she didn't want

 6         nothing.

 7    Q    She said she didn't want anything.

 8              What about your -- you know, you have

 9         given me a couple of different affidavits in

10         relationship to the robbery you were arrested

11         for.  Why don't you tell me a little bit about

12         your drug use history, if you don't mind.

13         Before you answer that question, let me just

14         state, I'm sorry I'm prying.  I don't mean to

15         embarrass you or I'm not trying to offend you.

16         It's just part of the case, okay?

17              MR. LIPSKY:  I object to the form of

18                the question as well.

19    BY MS. HOMES:

20    Q    Can you give me -- tell me, when you gave the

21         first affidavit when you were arrested by

22         Detective Balnis on the warrant, why don't you

23         tell me a little bit about what your drug use

24         was at that time.

25    A    Well, I was smoking marijuana since I was 16,
```

```
 1        so, I don't know, and, like, around that time I
 2        was doing PCP, Angel Dust.
 3    Q   What is PCP?
 4    A   I think it's Angel Dust or embalming fluid.
 5    Q   Are there any other drugs or narcotics that you
 6        used other than PCP and marijuana?
 7    A   No, only a drink here and there; that's it.
 8    Q   Alcohol.  No cocaine?
 9    A   No.
10    Q   Or anything like that?
11    A   No.
12                MS. HOMES:  Will you please mark this
13            for the record.
14
15                        (Defendant's Exhibit No. 1,
16                        Letter dated November 10, 2002,
17                        marked for identification.)
18
19                        (Defendant's Exhibit No. 2,
20                        Affidavit, marked for
21                        identification.)
22
23                        (Defendant's Exhibit No. 3,
24                        Voluntary statement, marked for
25                        identification.)
```

1    BY MS. HOMES:

2    Q    All right.  Mr. Brown, I'm going to show you

3         what has been marked as Defendant's Exhibit 1

4         and at the top it says, "Carl Brown."  If you

5         can just take a look at this document and tell

6         me if it looks familiar to you?

7    A    Yup.

8    Q    It looks like it's a letter -- well, in letter

9         form dated November 10, 2002 and, sir, is that

10        your signature at the bottom?

11   A    Yes.

12   Q    And it also looks like someone named Claudia

13        Wilson swore to the truth of it as an attorney

14        on the bottom; is that accurate?

15   A    Yes.

16             MR. LIPSKY:  Actually, she is a

17         Notary, but...

18             MS. HOMES:  Is it a Notary?

19   BY MS. HOMES:

20   Q    But there is no Notary stamp on it, it's just

21        her signature, right?

22   A    Well, let's put it -- she was in the house, one

23        of the ladies that worked.

24   Q    Who did you prepare this statement for?

25   A    For him. (Indicating.)

```
 1   Q    For Attorney Lipsky back in 2002?

 2   A    Yes.  That's when I was in the halfway house,

 3        right.  Jesus asked me if I would write a

 4        letter for him, for his lawyer, so I wrote it.

 5   Q    Did you meet with an attorney from this office,

 6        from Jesus's attorney's office, this attorney's

 7        office?

 8   A    No.

 9   Q    Who typed this for you?

10   A    I typed it.  At the halfway house they have a

11        computer.

12   Q    You typed it at the halfway house.  Who did you

13        hand it to?

14   A    Claudia.  She signed it, and I came and I gave

15        it to Jesus and he gave it to the lawyer.

16   Q    So, at this time, that's back in November of

17        2002, had you met with any of the lawyers here

18        in this law firm, here, that Jesus has working

19        for him?

20   A    No.

21   Q    You just worked with Jesus and did this for him

22        so he could give it to his lawyer for his case?

23   A    Uh-hum.

24            MR. LIPSKY:  If I can interrupt, this

25         is the original.  It's not well raised, but
```

Page 16

1              there is a seal on the bottom as well if

2              you want to feel it.

3                   MS. HOMES:  I do see it on the

4              original.  It doesn't come through on

5              the --

6                   MR. LIPSKY:  It's not raised enough to

7              make the photocopy.

8                   MS. HOMES:  Okay.

9    BY MS. HOMES:

10   Q    All right.  In this letter you state that at

11        the time you were arrested for the robbery, you

12        were already on probation, correct?

13   A    Uh-hum.

14   Q    And what happened when they violated your

15        probation?

16   A    They violated me under hindering prosecution,

17        or something like that, and gave me more

18        probation.  They said, "We have to leave your

19        probation regular," four years or something.  I

20        said, "All right."

21   Q    You didn't serve any time as a result of the

22        violation of probation?

23   A    No.

24   Q    They extended your probation or left it alone?

25   A    I think they left it or reinstated it, or

1          something like that.

2    Q    Okay.  All right.  Now I'm showing you what's

3          been marked as Defendant's Exhibit 2, and if

4          you could take a look at this.  At the top it

5          says, "Affidavit of Carl Brown."  Does this

6          document look familiar to you?

7    A    (Witness nods.)

8    Q    That's your signature at the bottom of the

9          second page.  It's a two-page document?

10   A    Yes.

11   Q    And this also, I believe, was sworn to by a

12        Notary public?  It says, "Notary public"?

13   A    Yeah.

14            MS. HOMES:  I imagine the original has

15        the raised seal then or no?

16            MR. LIPSKY:  I think the original was

17        filed with the court.

18            MS. HOMES:  Okay.

19            MR. LIPSKY:  I'm not positive.

20  BY MS. HOMES:

21   Q    Is this the document you created when you came

22        and were interviewed by Attorney Lipsky?

23   A    Uh-hum.

24            MR. LIPSKY:  No, it's actually here

25        and does have a raised seal.  (Indicating.)

```
 1                     MS. HOMES:  Okay.

 2                     MR. LIPSKY:  Objection to the form.

 3             You can answer the question.

 4   BY MS. HOMES:

 5    Q    Let me go ahead and put this in the record.

 6         This is Defendant's Exhibit 3, sir.  And if you

 7         could just take a look at that document.  It's

 8         two pages.  And just tell me if that looks

 9         familiar to you.

10    A    My handwriting.

11    Q    So this is a -- looks like it's a Voluntary

12         Statement, or at least the top of it says it's

13         a voluntary statement taken by the Waterbury

14         Police Department and that's your signature

15         there, "Carl Brown," on the bottom of the first

16         page.  Is that your signature, again, sir, on

17         the second page?

18    A    Uh-hum.

19    Q    Do you have a specific recollection as you sit

20         here today of what happened when you were

21         picked up by the police department on March 15

22         of 1999?

23    A    It was, like, I was on Vermont Street, and they

24         were chasing me because they said I had drugs

25         on me.  They were searching me and stuff and
```

1    there was no drugs.  And they brung me to the

2    police department, right here, and the

3    detectives upstairs, they was, like, "You're

4    going to be arrested for robbery."  I said,

5    "What?"  They said, "Robbery."  I say, "Huh?"

6    I said, "I didn't do no robbery."  They said,

7    "That's what the judge's going to hear.  Well,

8    if you sign this paper, then we'll let you out

9    on a PTA," something like that, "You go home."

10   I said, "All right.  Whatever."  I wanted to go

11   home.  They was like, "You sign the paper."  So

12   it's -- that's how they got my name.

13  Q    You never read the voluntary statement?

14  A    No.

15  Q    How long did that whole time that you spent

16       with the police take?  How long were you there?

17  A    I don't know.  I have no idea.  Basically I

18       stayed in the police station overnight.  But I

19       don't know how long I was there doing that.

20  Q    So what time do you think they picked you up?

21       Or what time did they finally catch you after

22       you were running?

23  A    In the afternoon sometime.

24  Q    And you wound up staying there overnight?

25  A    Yes.

Page 20

1   Q    And other than Detective Balnis, do you

2        remember the names of any other police officers

3        that you talked with?

4   A    No, I don't even remember him.

5   Q    You don't even remember who he is?

6   A    No.

7   Q    And in your affidavit here, sir, on Exhibit 2,

8        it claims that you swore that you were

9        interviewed by Detective Balnis.  How did

10       you -- did Attorney Lipsky tell you that's who

11       you were interviewed by?

12  A    He asked what the detective's name was.  I

13       said, "I don't know."  He said, "Balnis.  Does

14       that sound familiar?"  I said, "I guess, I

15       don't know."

16  Q    You don't know.  You guessed?

17  A    I don't know.  I only know the faces.

18  Q    So this was pretty much information Attorney

19       Lipsky gave you and asked you questions about

20       and you said, "Yeah, whatever," right?

21            MR. LIPSKY:  Object to the form of the

22            question.

23  BY MS. HOMES:

24  Q    Well, sir, let me ask you a question.  Do you

25       specifically have a recollection at the time of

TYSZKA REPORTING SERVICE

Page 21

```
 1          your arrest and interview by Detective Balnis,

 2          that that is who you were interviewed by?

 3    A     I don't know his name.

 4    Q     So who told you it was Detective Balnis?

 5    A     He asked on the papers, he told me, he said,

 6          "The warrant says you were arrested by -- the

 7          affidavit says you were arrested by Detective

 8          Balnis."  I said, "All right."

 9    Q     So you just agreed with what he told you?

10                MR. LIPSKY:  Object to the form of the

11          question.

12  BY MS. HOMES:

13    Q     All right.  Now, it says here in this affidavit

14          that Attorney Lipsky prepared for you to sign

15          that you were interrogated by Detective David

16          Balnis and other officers of the Waterbury

17          police department.  What other officers were

18          you interrogated by?

19    A     I just know there was a couple.  They stripped

20          me and everything.  I don't know the names.  I

21          think it was -- one came in, I don't know, from

22          the detective bureau.  I don't know.

23    Q     Okay.  And how long did this interrogation take

24          place?

25    A     Like 30, 45 minutes, I think.
```

```
 1    Q    30 or 45 minutes.  Do you know if you were
 2         interrogated more than one time during the
 3         course of your night there at the police
 4         department?
 5    A    I don't think so.
 6    Q    And maybe that -- were you interviewed or
 7         talked to by the police officers more than one
 8         time during the course of the evening?
 9    A    It was when they first got me, I think, when
10         they first had me in the chair, one person
11         talked to me.  And then they brought me to some
12         room with a computer.
13    Q    And it was one person that brought you to a
14         room with a computer in it?
15    A    Uh-hum.
16    Q    Now, I know I'm asking you to think back for a
17         long time ago.  The first time that they talked
18         to you, whoever it was, do you know how long
19         that took?
20    A    No.  I have no idea.  I don't know.
21    Q    How about the time that you went into the room
22         with the one guy with the computer, how long
23         did that take?  Was that the 30 or 45-minute
24         time frame period?
25    A    I think so.
```

```
 1   Q   Now, it's true that you -- look at Defendant's
 2       Exhibit 3.  This is not a handwritten
 3       statement, correct?
 4   A   Huh-uh.
 5   Q   And you didn't type this document, correct?
 6   A   No.
 7   Q   This was typed by somebody else, correct?
 8   A   Yes.
 9   Q   Are these your initials here, sir?
10   A   Uh-hum.
11   Q   What does that say, "CB"?
12   A   Yes.
13   Q   That's on the first page of the document next
14       to where your name is "Carl Brown," correct?
15       Do you recall putting your initials on there?
16   A   Yeah.
17   Q   And looking at the second page, sir, just to
18       confirm, I see what looks like another initial
19       "CB" on the second page.  Are those your
20       initials?
21   A   Uh-hum.
22   Q   Do you recall putting your initials there?
23   A   Uh-hum.
24   Q   Why don't you tell me how you met Jesus DeLeon.
25   A   I met him through my little brother.  I just
```

1      got out of jail in '98, somewhere around there.

2      I was at my house on Ashley Street.  And my

3      little brother brung him to the house and said,

4      "This is my friend Rubio."

5  Q   I'm sorry.  He called Jesus, Rubio?

6  A   Yeah.

7  Q   Is that a nickname for Jesus?

8  A   I don't know.  I guess.

9  Q   Do you call him Rubio now?

10  A   Yeah.

11  Q   And is it fair to say you met him at a party?

12  A   No, it wasn't a party.  I was at home.

13  Q   You were just home.  Who else was at your

14      house?

15  A   Me and my girlfriend at the time, Jessica

16      Hickey, my girlfriend, and I think my mother

17      and my other cousin, and then my little brother

18      came in.

19  Q   How come you guys were all over there?

20  A   Chillin', hanging out.  Me and my girl was

21      staying there, like.

22  Q   This was where, what address was that at?

23  A   16 Ashley.

24  Q   16 Ashley Street?

25  A   Yeah.  We were on the second floor.

```
1    Q    Did you ever live at Dikeman Street?

2    A    Yeah.

3    Q    Is that the address you were at?

4    A    No, not when I met him.

5    Q    The first time you met him, you were at Ashley

6         Street?

7    A    Uh-hum.

8    Q    Okay.  Is that your mother's apartment, 69

9         Ashley Street?

10   A    Uh-hum.

11   Q    Is that the right address, 69?

12   A    Uh-huh.

13   Q    Were you living with your mom at that time?

14   A    Yup.

15   Q    Do you remember, was that in 1999?

16   A    I guess.  I think so, yeah.  At the beginning

17        of '99, I think.

18   Q    Is it possible that you knew him in '98?  '99

19        is when the alleged robbery took place.  You

20        knew him how much before that time that you got

21        arrested?  About.

22   A    A year.

23   Q    So it could have been 1998 then?

24   A    Uh-hum.

25   Q    And where did Jesus live before he came to
```

```
 1            Waterbury?

 2     A      I heard from now, whenever, he said New York, I

 3            guess.

 4     Q      He said he was from New York.  And the time

 5            that he said -- he came over with your brother?

 6            He came over with --

 7     A      Yeah.

 8     Q      What's your brother's name?

 9     A      Joseph Thompson.

10     Q      They came over to your mother's house, it was

11            your birthday party, right?

12     A      We weren't having a party.  It wasn't no party.

13     Q      Was it your birthday around that time when you

14            met Jesus?

15     A      Probably, I don't know.

16     Q      Probably?

17     A      I don't know.

18     Q      So after you first met Jesus, why don't you

19            just tell me -- you guys became friends then or

20            started hanging out after then?

21     A      Started hanging out.

22     Q      How much?

23     A      Well, like, probably, like, every other day or

24            something like that.  He would come to the

25            house and hang out.  I wasn't trying to go out.
```

```
 1              I just got out of jail so I was trying not to
 2              do nothing to get in trouble.
 3     Q        What had you just gotten out of jail from?
 4     A        Larceny, I think; I did six months.
 5     Q        When did you guys move over to Dikeman Street,
 6              26 Dikeman Street?
 7     A        Like sometime in '99 because I meet Jesus and I
 8              had needed a place to stay.  I knew him from
 9              '98.
10     Q        You did or he did?
11     A        I did.  He said, "I live with my girl.  You can
12              rent a room from me if you want."  I said, "All
13              right, cool."
14     Q        So he lived on Dikeman Street first?
15     A        No, no.  No, that was just like recent.  Like
16              in '99.
17     Q        But in '99, was it Jesus who already had an
18              apartment on Dikeman Street before you moved
19              in?
20     A        Huh-uh.
21     Q        His girlfriend did?
22     A        Yeah.
23     Q        Who is his girlfriend?
24     A        Ramika.
25     Q        Dozier, D-O-Z-I-E-R?  Does that sound right?
```

Page 28

```
 1    A    Yeah.

 2    Q    So the two of you moved into Ramika's house

 3         then?

 4    A    (Witness nods.)

 5    Q    You wanted to get out of your mom's house?

 6    A    Yeah.

 7    Q    Did your girlfriend live with you, too?

 8    A    No.

 9    Q    What floor of the Dikeman Street apartment did

10         you live on?

11    A    Third floor.

12    Q    I'm sorry?

13    A    Third floor.

14    Q    Third floor, okay.  Now, does Ramika have a

15         nickname, too?

16    A    I have no idea.

17    Q    You don't know?

18    A    No.  I just knew Ramika.

19    Q    Did you ever hear her called -- maybe I'm -- do

20         you know Vince Lovett, too, right?

21    A    I met her at Dikeman.

22    Q    You met Vince Lovett when you were living at

23         Dikeman?

24    A    Yes.

25    Q    Did he live on Dikeman as well?
```

```
 1    A    Yes, second floor from us.

 2    Q    And did he have a girlfriend?

 3    A    I guess, yeah.

 4    Q    What's her name?

 5    A    Shawna or something.

 6    Q    Shonta?  Were you friends -- so you became

 7         friends with Vince as well?

 8    A    No, not really.  I just met him.  He wasn't my

 9         friend.

10    Q    All right.  Now, if you look at your statement,

11         sir, I'm kind of reaching over here so you can

12         read along with me here, your testimony is that

13         you never read this document.  You just signed

14         it without reading it, correct?

15    A    Uh-hum.

16    Q    You're also telling us in this Exhibit 2

17         affidavit that you didn't tell the officers any

18         information about yourself; is that true?

19    A    Huh-uh.  Only where I lived at.

20    Q    You did.  You said you talked to them about 30

21         or 45 minutes about your situation?

22    A    Uh-hum.

23    Q    Did you tell them that you knew Jesus during

24         that conversation?

25    A    Did I know him?
```

1   Q   Yes.

2   A   They didn't even ask.

3   Q   How did they know you knew Jesus DeLeon then?

4       Was he a mind reader?

5   A   That's who, he said, "Who do you stay with?"  I

6       said, "My man, my friend, Jesus and his

7       girlfriend Ramika."

8   Q   It's fair to say in the beginning here that you

9       did tell Detective Balnis that you knew a

10      Spanish guy named Jesus; is that right?

11   A   Uh-hum.

12   Q   We'll go through this.  Maybe some of it you

13      said and maybe some of it you didn't.  Okay?

14      So this says on April 18, 1998 that you met a

15      Spanish guy at your mother's apartment on 69

16      Ashley Street.  Is that a fairly accurate

17      statement of what you told Detective Balnis?

18   A   Well, I don't know at that time, April 18.

19   Q   Was that about the right date?

20   A   I guess.  I don't know.

21   Q   Is it fair to say that you met him, as you just

22      told me, when your brother brought him over to

23      your mother's apartment?

24   A   Yeah.

25   Q   So it's fair to say that you told